COMMONWEALTH of Kentucky, DEPARTMENT OF HIGHWAYS, Appellant,

v.

Charles E. WILLIAMS et al., Appellees.

Court of Appeals of Kentucky.

Feb. 26, 1965.

See also, Ky., 383 S.W.2d 687.

John B. Breckinridge, Atty. Gen., William A. Lamkin, Jr., Ass't. Atty. Gen., Frankfort, L. A. Faurest, Faurest & Collier, Elizabethtown, Dandridge F. Walton, Madisonville, for appellant.

Clarence Bartlett, Woodward, Bartlett & McCarroll, Owensboro, for appellee.

STEWART, Judge

In this highway condemnation proceeding instituted by the Commonwealth of Kentucky, Department of Highways, against the landowners, the Williamses (five in number), the latter recovered $11,682. The jury broke the verdict down as follows: $5512 for the land taken, $5670 for damages to the remainder of the land, and $500 for fencing. This action grew out of the acquisition of land for the construction of the Western Kentucky Turnpike. (This case was tried before the decision of this Court in Commonwealth, Department of Highways v. Sherrod, Ky., 367 S.W.2d 844.) The Department of Highways appeals, urging these grounds for reversal:

First, it was prejudicial error to admit testimony that the landowners were damaged by the construction of a fill on a county road which leads to the turnpike. This fill bisects certain grazing land and makes it necessary to cross and recross beyond the fill in order to move livestock from one pasture to another on each side of it.

Second, it was prejudicial error to allow testimony that a portion of the farm of the landowners, known as the "bottom land," would be permanently impaired by flooding when it is claimed to have been conclusively shown the completed turnpike project will have ditches and a culvert which will adequately drain the affected area.

Third, the evidence does not support the verdict.

Appellees own a farm of 230 acres, originally, located on a gravel road in Ohio County near Beaver Dam. The farm has been utilized for general farming and for raising beef cattle. The Western Kentucky Turnpike runs generally in an east-west direction across it, and 19.48 acres were condemned for the turnpike, 6.71 acres were taken for the county road fill, 15.4 acres were landlocked and 5.6 acres were cut off from the main tract. The turnpike runs through a cut about 22 feet in the center.

A county road traverses appellees' farm and intersects the turnpike at approximately a right angle. To avoid its crossing at grade, this road was elevated and land on each side of the road was acquired so that the right·of way would be wide enough to construct the necessary fill. In all, 6.71 acres were taken for this purpose. The section of the fill on the county road at the turnpike is about 25 feet high and of some length. It is contended that when changing livestock to pastures separated by the fill the livestock cannot be safely driven on and over the road at this location. However, it was pointed out that livestock can be driven across the road at other places.

Charles E. Williams, one of the landowners, was permitted to testify that, before the fill was made on the county road, he could transfer his livestock without danger from one portion of his farm to the portion on the opposite side of the road, but with the fill as a barrier he cannot do this with safety and will often be compelled to cross the road at points considerably distant from where the livestock is pastured. Appellees' witness, Edgar Barnard, was also permitted to testify about this condition and to state that the fill reduces the value of the farm $500. This evidence was objected to for the claimed reason that it was incompetent.

■ Appellant argues appellees raised an access question involving the use of a public road when they introduced this line of testimony. See Commonwealth, Department of Highways v. Carlisle, Ky., 363 S. W.2d 104. We cannot subscribe to this view. Here the situation is that certain pasture land is cut into parcels by the fill, thus creating difficulty when the road must be passed over with livestock in order to utilize available lands elsewhere on the farm. Such a condition certainly depreciates the over-all market value of the farm, as it materially adds to the burden of livestock production.

■ An act by the condemnor which destroys the use to which land has been devoted, or which places a substantial and additional burden on the landowner to maintain that use, is a "taking" of his property. See Commonwealth v. Kelley, 314 Ky. 581, 236 S.W.2d 695. We believe this testimony was competent.

Turning to the second contention, it was shown that the turnpike crosses and obstructs a drainage ditch which had been dug by appellees. This ditch followed the course of an old natural drain across the farm from north to south and no opening was made for it under the turnpike as constructed; instead, an attempt was undertaken by appellant to cause the water to flow west in a new ditch to a creek at the western boundary line of appellees' farm and thence through a culvert under the turnpike embankment.

At the trial it was brought out that in the future the ditch as actually constructed will not take care of the increased flow of water. Also, the evidence of appellees was to the effect that when water gets 14 inches deep in the ditch at the culvert it will then run out onto the surface of the bottom land and remain there until it subsides in the culvert to a depth of less than 14 inches. Some flooding has already occurred on the bottom land since the completion of the culvert.

The position is taken that no corrective measures of appellant will alleviate the flooding propensities of the new drainage system. Upon this theory appellees' witness, Edgar Barnard, was permitted to testify seven acres of the bottom land will be rendered "almost worthless" as a result of periodic flooding. He fixed this damage at $2500. Another of their witnesses, Tim Barnes, stated that nine acres of the bottom land will be destroyed for crop-raising purposes. He valued this land at $2700.

Appellant introduced its consultant engineer, Rubin D. Medley, and we quote his answers to certain questions propounded to him concerning the drainage of the farm:

"Q. 10 The work has not been completed, did you say Mr. Medley?

"A.  I think I did, the work has not been completed, no sir.

"Q. 11  Are you in charge of the work and know what will be done on it?

"A.  Yes sir.

\* \* \* \* \* \*

"Q. 14  Will it be completed?

"A.  Yes sir.

"Q. 15  Will it drain the water which comes down the ditch across the Williams Farm when completed?

"A.  Yes sir."

Appellant's view is that the flooding was considered permanent by most, if not all, of appellees' witnesses and, in consequence, affected their estimates of the damage to the land. Appellant assumes, too, the flooding will be temporary, and in this connection relies upon the statement of engineer Medley that this will be solved in the foreseeable future. Appellees contend it would not matter how deep the new ditch should be dug at the entrance to the culvert, as that in no wise would affect the flow through the culvert so as to take care of the extra load of water to be discharged from time to time through this outlet.

■ We conclude under the facts presented the jury was properly allowed to determine whether the flooding was temporary or permanent and to consider what damages arose therefrom. As a matter of fact it was established some damage from flooding had already been done. Furthermore, the claim of the landowners for flooding, temporary or permanent, was properly injected into this proceeding and the inclusion of such a claim would preclude its being made the subject of a subsequent action. See Commonwealth, Department of Highways v. Cardinal Hill Nursery, Ky., 380 S.W.2d 249.

■ The final complaint is that the evidence does not support the verdict. Appellant's highest appraisal of the land condemned, namely, 26.19 acres for the highway right of way, was at $110 per acre; appellees' witnesses set the market value of this land at $300 per acre. The jury awarded the landowners $5512, which figure indicates they fixed their valuation in this respect at almost $200 per acre.

The amount of property landlocked or severed from the main tract consists of 21 acres, and appellant's highest estimate of the damage to this land was $100 per acre; in fact, this land was treated by appellant as having been "taken." Appellant's witnesses thought no other damages resulted. Two of appellees' disinterested witnesses gave opinions that the 21 acres were damaged $150 per acre; others testified it was damaged more. As has been shown, appellees' witnesses produced evidence which tended to show $2500 to $2700 damages to the bottom land because of flooding and $500 damages to the farm on account of the fill on the county road. The jury found $5670 in favor of the landowners for damages at large to the remainder.

We are of the opinion the evidence sustains the jury verdict as to the allowance for the land taken and the damages to the remainder.

It appears, however, appellant's criticism is not leveled so much at the amount of the verdict as at the quality of the evidence upon which it is based. Appellant avers its evidence is "clear and uncontradicted," whereas that of appellees is "vague" and was given by men of "limited knowledge of the facts." We answer such charges by simply stating that the record does not uphold these bare assertions. Appellees proved their case well.

Wherefore, the judgment is affirmed.